IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ELAINE L. CHAO, SECRETARY OF ) 
LABOR, UNITED STATES ) 
DEPARTMENT OF LABOR, ) 
      Plaintiff, )     Civil Action No. 04-1764
 ) 
    vs. )     Judge Cercone
 )     Magistrate Judge Mitchell
BARKER BROTHERS, INC., d/b/a ) 
PITTSBURGH NORTH AIRE RIDE, ) 
      Defendant. ) 

## REPORT AND RECOMMENDATION

I.    <u>Recommendation</u>

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant Barker Brothers, Inc., d/b/a Pittsburgh North Aire Ride (Docket No. 15) be

denied.  It is further recommended that the cross-motion for partial summary judgment submitted

on behalf of Plaintiff Elaine L. Chao, Secretary of Labor (Docket No. 19) be denied.  It is further

recommended that the motion to strike portions of the Declaration Under Penalty of Perjury of

Wage and Hour Investigator David Havrilla, which was attached as Exhibit A to Plaintiff's

Appendix of Evidence in Support of Her Cross-Motion for Partial Summary Judgment and

Opposition to Defendant's Motion for Summary Judgment, submitted on behalf of Defendant

(with Docket No. 24) be denied.

II.    <u>Report</u>

Plaintiff, Elaine L. Chao, Secretary of Labor, United States Department of Labor

("DOL"), brings this action against Defendant, Barker Brothers, Inc., d/b/a Pittsburgh North Aire

Ride ("PNAR"), alleging that it has violated sections 7 and 15(a)(2) of the Fair Labor Standards Act, 29 U.S.C. §§ 207, 215(a)(2) ("FLSA"), by failing to pay certain of its employees overtime at rates not less than one and one-half times the regular rates at which they are employed for the hours they worked in excess of 40 per week.

Presently before this Court for disposition are cross-motions for summary judgment. Defendant argues that it is exempt from the overtime provisions of the FLSA because its business falls squarely within the taxicab exemption, 29 U.S.C. § 213(b)(17). Plaintiff contends otherwise and seeks partial summary judgment on the issue of PNAR's liability. For the reasons that follow, both motions should be denied. In addition, Defendant has filed a motion to strike portions of the Declaration Under Penalty of Perjury of Wage and Hour Investigator David Havrilla, which was attached as Exhibit A to Plaintiff's Appendix of Evidence in Support of Her Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment. For the reasons that follow, this motion should be denied.

Facts

PNAR has authority from the Pennsylvania Public Utility Commission (PUC) to operate three kinds of services: a paratransit service, a call-or-demand service and an airport transfer service. (Barker Dep. at 30-34; Barker Aff. ¶¶ 10, 17 & Ex. C.)[1] Paratransit service requires an advance reservation, generally at least 24 hours prior to the trip. (Barker Dep. at 30-31, 106, 133; Def.'s App. Ex. E. at BB/DOL 000012.) Call-or-demand service is identical to paratransit, except that passengers may call or demand same-day transportation. (Barker Dep. at 31, 115-16,

---

[1] The deposition of William J. Barker is attached to Defendant's Appendix (Docket No. 18) as Exhibit B. The affidavit of William J. Barker is attached to Defendant's Appendix as Exhibit A.

2

128; Barker Aff. ¶ 12.)  Airport transfer service generally requires advance reservation for trips originating or terminating at an airport terminal, no later than the previous calendar day between the hours of 8:00 a.m. and 5:00 p.m, Monday through Friday.  (Barker Dep. at 31, 53, 116-17; Barker Aff. Ex. E at BB/DOL 000023.)  Except for these differences, the services are the same. (Barker Dep. at 52; Barker Aff. ¶ 12.)

These operating authorities permit PNAR to transport passengers to and from the airport and "between points within an airline distance of fifty (50) statute miles of the Armstrong County Courthouse in the Borough of Kittanning, Armstrong County."  (Barker Aff. Ex. C; Barker Dep. at 33.)  In addition to the operating authority granted by the PUC, PNAR also has a paratransit/call-or-demand certificate from Allegheny County allowing it to operate from points within Allegheny County and it is licensed as a common carrier by the Interstate Commerce Commission and the PUC of Ohio.  (Barker Dep. at 34-36; Barker Aff. ¶ 11 & Exs. D-E.)  PNAR does not have contracts to provide transportation to transportation terminals in Pennsylvania or Ohio.  (Barker Dep. at 46.)

William J. Barker, President and an owner of PNAR since 1992, states that PNAR operates between Pennsylvania and points in Ohio and West Virginia.  (Barker Dep. at 15, 39, 42.)  However, Wage and Hour Investigator David Havrilla found only one employee who traveled out of Pennsylvania, and this was under "special circumstances."  (Havrilla Decl. ¶ 17(t).)[2]  Plaintiff notes that Mr. Barker had no specific knowledge as to the frequency of PNAR's operation outside Pennsylvania: he said drivers do so "on occasion" and that operation

---

[2]The Declaration Under Penalty of Perjury of Wage and Hour Investigator David Havrilla is attached to Plaintiff's Appendix as Exhibit A (Docket No. 19-7).  As discussed below, Defendant's motion to strike certain portions of Mr. Havrilla's declaration should be denied.

outside Pennsylvania would be "a smaller portion" of the income of the business.  (Barker Dep. at 38-40, 42, 49.)

The parties agree that PNAR operates a paratransit service.  (Barker Dep. at 31-33; Havrilla Decl. ¶ 10.)  Plaintiff contends that PNAR's business consists of "providing paratransit transportation to the elderly and handicapped.  These [sic] are almost exclusively for medically-related appointments."  (Havrilla Decl. ¶ 10.)  However, Thomas E. Hockenberry, general manager at PNAR, affirms in an affidavit that PNAR provides service to the entire community: "Though some of [PNAR's] passengers are elderly and handicapped, we do not limit our transportation services to the elderly and handicapped.  [PNAR] is a common carrier, and we provide our transportation services to the general public, without limitation or distinction to the type of passenger served."  (Hockenberry Aff. ¶ 7.)[3]  Mr. Barker states that the typical PNAR passenger is not elderly and that service to the handicapped is "random."  (Barker Dep. at 144.)

Plaintiff also contends that PNAR does not actually operate the other two types of services for which it is licensed.  It notes that Mr. Barker was unable to state what percentage of PNAR's business consists of airport transfer service or call-or-demand service.  (Barker Dep. at 57-59.)  Mr. Havrilla reports that drivers told him that they transport passengers almost exclusively to and from medically-related appointments and that they were told by PNAR management that they are not a taxicab service and they do not hold themselves out as such. (Havrilla Decl. ¶ 17(q)(u).)  He also states that both the drivers and management–Mr. Hockenberry and James Seaman (counsel for PNAR)–told him that, since "9/11," PNAR has not

---

[3]The affidavit of Thomas E. Hockenberry is attached to Defendant's Appendix in support of its reply brief as Exhibit B (Docket No. 27-3).

provided routine airport service.  "Rather, I was advised that, since that time, PNAR provided only limited, on an as needed basis, transportation to the Pittsburgh airport."  (Havrilla Decl. ¶¶ 11, 17(ff).)

Mr. Barker and Mr. Hockenberry state that PNAR is engaged in all three types of service, although Mr. Barker admitted that the percentages for call-or-demand and airport transfer services are small.  (Barker Aff. ¶ 13; Barker Dep. at 57; Hockenberry Aff. ¶ 7.)  Mr. Barker further explained that PNAR requested and received a one-year suspension of its airport transportation service after "9/11" and that the service was reinstated in October 2002.  (Barker Dep. at 119-20 & Ex. E at BB/DOL 000024-25.)

PNAR employs approximately 75 drivers.  (Barker Dep. at 122.)  All drivers are required to have a Class C license, which allows a driver to operate a vehicle up to 26,000 pounds, and they are all capable of providing any of the services offered by PNAR.  (Barker Aff. ¶¶ 15-16; Barker Dep. at 58, 68.)  The drivers wear white shirts and black pants with PNAR identification. (Barker Dep. at 93; Havrilla Decl. ¶ 17(v).)  PNAR trains its drivers in how to load and unload passengers, operate wheelchair lifts and drive defensively, but not in first aid, C.P.R. or other forms of medical assistance.  (Barker Dep. at 93-94; Hockenberry Aff. ¶ 18.)

Drivers are paid straight time, based on an hourly rate of between $6.00 and $8.00, with no opportunity to earn additional money through their own initiative or otherwise.  (Barker Dep. at 72-73, 92; Havrilla Decl. ¶ 17(b)(d).)[4]  Drivers are not permitted to receive tips.  (Barker Dep. at 73, 92; Havrilla Decl. ¶ 17(c).)  Mr. Hockenberry states that there is nothing posted in the

---

[4]Mr. Barker stated that the range was from $6.00 to $7.50, although he then said "I don't even know whether I'm correct with that."  (Barker Dep. at 73.)

vehicles indicating that passengers should not tip the driver and that some passengers insist on tipping the drivers and the drivers accept these tips despite the fact that they have been told not to do so.  (Hockenberry Aff. ¶ 15.)

PNAR has a fleet of about 66 small motor vehicles which includes automobiles and minivans.  The automobiles typically hold five passengers and the minivans accommodate eight or fewer passengers.  (Barker Aff. ¶ 14; Barker Dep. at 60-61; Havrilla Decl. ¶ 17(z).)  The 12 minivans are equipped with wheelchair lifts for handicapped passengers.  (Barker Dep. at 64; Havrilla Decl. ¶ 17(f); Hockenberry Aff. ¶ 17.)  The vehicles are kept at PNAR's principal place of business in Kittanning, Pennsylvania, in parking lots leased for this purpose.  Some drivers are permitted to drive the vehicles to their homes so that they can service rural areas without having to drive long distances to get there, but these drivers are not permitted to use the vehicles for their personal use.  (Barker Dep. at 65-66; Havrilla Decl. ¶ 17(i).)

All of the vehicles used by PNAR are either owned by PNAR or leased by PNAR from Barker Leasing, a separate company also owned by Mr. Barker.  PNAR provides its drivers with company cards to pay for gas.  (Barker Dep. at 62; Havrilla Decl. ¶ 17(y).)  The repair work is done by "Barker, Inc."  (Barker Dep. at 65.)  Barker, Inc. is another company owned by Mr. Barker.  (Barker Dep. at 28-29.)

PNAR does not operate at or from any taxi stands.  (Barker Dep. at 91.)  None of the vehicles used by PNAR in its business have special license plates or license plates designating the vehicle as a "taxi."  (Barker Dep. at 61-62; Havrilla Decl. ¶ 17(bb).)  Mr. Hockenberry states that, at the time Mr. Havrilla conducted his investigation, PNAR had more than two dozen vehicles with "taxi" plates on them.  He further states that he observed Mr. Havrilla walk by

some of these vehicles as he approached the office building.  (Hockenberry Aff. ¶ 10.)[5]

The vehicles are marked with the company name, phone number and PUC number, but they do not have light domes to show a vacancy.  (Barker Dep. at 67; Havrilla Decl. ¶ 17(h).)  All vehicles contain a two-way radio.  (Barker Dep. at 91-92.)

None of the vehicles have meters.  (Barker Dep. at 96.)  Plaintiff contends that the PUC and the Pennsylvania Code require all taxicabs to either have meters or to maintain detailed mileage logs conforming to specific requirements and that there is no distinction between "rural" and "metropolitan" taxi services.  The Pennsylvania Code does require all call-or-demand service drivers to maintain log sheets with requested information completed.  52 Pa. Code § 29.313(c).  However, meters are only required in call-or-demand vehicles operated within a city, borough or township having a population of 20,000 or more.  52 Pa. Code § 29.314(b)(1).  Defendant cites census data indicating that the various boroughs and townships within Allegheny and Armstrong Counties within which PNAR has authority to operate a call-or-demand service have populations well below 20,000 people.  (Barker Aff. Ex. C; Shannon Aff. ¶ 2 & Ex. A.)[6]  Plaintiff has not cited any evidence to the contrary.

Mr. Barker states that drivers maintain log books in which they keep track of the mileage for each passenger transported.  (Barker Dep. at 84, 110.)  Mr. Havrilla's information is that drivers transporting passengers that are customers of one of the government agencies contracting

---

[5]Defendant contends that Mr. Barker's testimony that all of the vehicles look the same (Barker Dep. at 61-62) is not inconsistent with Mr. Hockenberry's affidavit because the latter refers to the time Mr. Havrilla conducted his investigation.  (Docket No. 34 at 4 n.11.)

[6]The affidavit of Sarah L. Shannon is attached to the Appendix in support of Defendant's reply brief as Exhibit C (Docket No. 27-4) .

with PNAR do not track any mileage.  (Havrilla Decl. ¶ 17(ee).)

Mr. Barker states that the rates are posted on the dashboards of each vehicle, but the employees interviewed by Mr. Havrilla stated that the rates were not posted anywhere inside the vehicles.  (Barker Dep. at 96; Havrilla Decl. ¶ 17(g).)  Mr. Hockenberry states that, from time to time, the laminated cards with the rates on them disappear for reasons unknown, but when PNAR becomes aware of this, the cards are replaced.  (Hockenberry Aff. ¶ 13.)

PNAR establishes its own rates for transportation, subject to the approval of the PUC. (Barker Dep. at 96-97.)  Flat rates are also set through contracts PNAR has with certain government agencies to provide transportation for all "customers" of the respective agency. (Barker Dep. at 96-97; Havrilla Decl. ¶ 17(x).)  Rates for airport transfer service are determined by the trip, rather than the mile, as paratransit and call-or-demand are charged.  (Barker Dep. at 97.)  PNAR does not impose additional charges because of the type of vehicle used or because the passenger may require assistance by one or more employees, or for early morning or late evening transportation.  (Barker Dep. at 103-04.)

Mr. Hockenberry states that:

> Rates-per-mile are predetermined.  The actual cost of any trip (other than an airport transfer) cannot be determined until the trip is completed, because the cost is determined by multiplying odometer mileage while the passenger is in the vehicle (or "loaded" miles) times the appropriate rate-per-mile.  Fares charged to airport transfer passengers are determined at the time the trip is scheduled, by multiplying the appropriate rate-per-mile times a mileage factor assigned to the zone from which the passenger will either begin or end his or her airport transfer trip.  In other words, airport transfer fares are general-miles-based rather than odometer-based.

(Hockenberry Aff. ¶ 12.)

Mr. Havrilla states that PNAR drivers typically transport more than one person at a time;

8

this is referred to as "ride-sharing." (Havrilla Decl. ¶ 17(p).) Mr. Hockenberry states that ride-sharing "is an accepted practice in the taxicab business. On occasion, [PNAR] transports more than one passenger at a time." (Hockenberry Aff. ¶ 14.) Mr. Barker said that, on many trips, drivers transport only one passenger at a time. (Barker Dep. at 79.)

Each morning the drivers are given a schedule listing their pick-ups, which have been pre-arranged the night before. (Barker Dep. at 69, 72.) During the day, the drivers may be called on the radio by dispatch with additional pick-ups. (Barker Dep. at 71.) A passenger can request a termination point other than the one previously arranged, but the driver has to telephone dispatch for approval. (Barker Dep. at 88, 143.) PNAR drivers operate everywhere within their operating authority and do not operate on fixed routes. (Barker Dep. at 75, 78-79; Barker Aff. ¶ 18; Havrilla Decl. ¶ 17(e).)

Mr. Barker states that drivers may pick up individuals on the street if they telephone dispatch for clearance. (Barker Dep. at 64, 73-74.) He also states that the schedules may change for "a number of different things." (Barker Dep. at 144.) Mr. Havrilla states that the schedules rarely change, that drivers are not permitted to change the schedule, that they cannot pick up passengers who have not pre-arranged a trip, and that the only reason a driver may receive a different or extra trip during the day is because another driver is running late and needs assistance keeping scheduled trips. (Havrilla Decl. ¶ 17(j)(k)(*l*)(m).)

Mr. Hockenberry states that:

> Drivers' schedules change daily. In my experience as a driver, my schedule changed because of cancellations, add-ons, urgent care trips, no-shows, breakdowns, and poor road conditions. Additionally, in my current position, I observe the drivers' schedules being changed daily for these same reasons. Moreover, the drivers' schedule is only intended to serve as a guidepost. If transporting multiple passengers, the driver determines the order in which he will

pick-up and discharge his passengers, based upon his passengers' origination points and destinations and the times the passengers must arrive at their destinations; in all cases, drivers have discretion to select the route taken. Passengers frequently request destination changes and additional, unscheduled stops during their transport. Drivers are required to radio dispatch to get clearance for these changes. This required communication is intended to and does ensure coordination among our drivers and the safety of the drivers. Additionally, it provides dispatch with information to answer passengers' questions concerning their own pick-up time. Drivers are also in direct communication with one another over the radio, and they adjust their schedules based upon these communications. As an example, a driver may request that another driver handle a transport for him if he is running late. These adjustments are then radioed into dispatch for the same coordination and driver safety reasons. Also for the same coordination and safety reasons, drivers also contact dispatch when they secure additional passengers and pick up customers who "hail" them.

(Hockenberry Aff. ¶ 16.)

Mr. Barker states that drivers can wait for passengers and that there is no maximum amount of time they can wait. If waiting would interfere with the driver's schedule, the driver contacts dispatch and dispatch makes adjustments accordingly (e.g., by sending another driver to handle the next pick-up). (Barker Dep. at 87-88.) Mr. Havrilla relates that PNAR drivers said they are instructed by the company not to wait for passengers. (Havrilla Decl. ¶ 17(m).)

Mr. Barker states that PNAR operates 24 hours a day, 7 days a week. (Barker Dep. at 75.) Individuals will reach a live dispatcher from 5:00 a.m. until 9:00 p.m. Between 9:00 p.m. and 5:00 a.m., PNAR utilizes an answering service. (Barker Dep. at 75-76.) Mr. Havrilla states that no drivers work later than 9:00 p.m. or earlier than 6:00 a.m. and that all drivers work only one shift, starting in the morning and ending in the evening. (Havrilla Decl. ¶ 17(dd).)

Driving people to doctor's appointments is the predominant part of PNAR's business. (Barker Dep. at 78.) Mr. Havrilla states that the drivers "transport passengers almost exclusively to and from medically related appointments." (Havrilla Decl. ¶ 17(q).) Mr. Barker states that

PNAR also provides trips to the airport, rides to pick up a car and rides to enable the passenger to visit someone.  (Barker Dep. at 77-78.)

Mr. Barker states that no passenger has a standing reservation with PNAR to be picked up on a recurring basis, such as at his or her home at the same time each week.  If the passenger wants transportation on the same day, at the same time, to the same location, the passenger must prearrange each trip separately.  (Barker Dep. at 80, 86-87, 124-25; Barker Aff. ¶ 19.)  Mr. Havrilla's information is that "certain passengers have standing weekly medical appointments such as for dialysis treatment or drug rehabilitation, for which PNAR provides their transportation to and from the treatment."  (Havrilla Decl. ¶ 17(r).)

Mr. Barker states that passengers can call drivers directly to request transportation, although the driver is instructed to call dispatch for approval.  (Barker Dep. at 93.)  Plaintiff notes that this testimony appears to contradict Mr. Barker's other statements that passengers contact dispatch, not the drivers, and that the vehicles have only two-way radios, not telephones.  (Barker Dep. at 81-82, 84, 91-92; Havrilla Decl. ¶ 17(n).)

Mr. Barker states that individual passengers pay the drivers directly, but individuals whose transportation is pursuant to a contract with a government agency do not pay the driver directly; rather the agency pays PNAR.  (Barker Dep. at 101-02.)  Mr. Havrilla's information is that no passengers pay the driver directly and the drivers do not handle any money; individuals whose transportation is not pursuant to a government agency contract pay dispatch.  (Havrilla Decl. ¶ 17(s).)  PNAR accepts credit cards for airport transfer only.  (Barker Dep. at 102.)

PNAR advertises its services in the telephone book under the heading "Transportation," not "Taxicabs."  (Barker Aff. ¶ 24; Barker Dep. at 129; Havrilla Decl. ¶ 17(w).)  There are

several services similar to PNAR operating in Armstrong County and the surrounding regions. (Barker Dep. at 135.)

PNAR has contracts with various agencies, including the Community Action Agency, Armstrong Mid-County Transit, the Agency on Aging and a drug and alcohol rehabilitation agency, where it offers its services to various individuals through the agency, which pays PNAR for the trip. (Barker Dep. at 81-83; Barker Aff. ¶ 20; Hockenberry Aff. ¶ 8; Havrilla Decl. ¶ 17(cc).) Pursuant to these contracts, individuals requiring transportation provide the agency with information about the trip, and then the agency contacts PNAR with that information to schedule the trip. (Barker Dep. at 84-85.) Mr. Hockenberry states that no contract is for recurrent transportation: "Each time a passenger requires transportation, the passenger (or the agency, if applicable, on the passenger's behalf) must schedule the trip with [PNAR]." (Hockenberry Aff. ¶ 8.)

Procedural History

Wage and Hour Investigator David Havrilla was first assigned to investigate PNAR in 1999 and he found that it had failed to pay overtime to 49 drivers of paratransit vehicles in the amount of $62,327.00 for the period January 1998 through January 2000. A letter was sent to Mr. Barker and his attorney but the Wage and Hour Office declined to take further action at that time. (Havrilla Decl. ¶¶ 6-7.)

In February 2003, Mr. Havrilla was assigned to conduct a second investigation which led to this lawsuit. The investigation began on May 1, 2003 and covered the period from May 2001 through May 2003. Mr. Havrilla first met with Mr. Seaman and Mr. Hockenberry on May 1, 2003. He learned that PNAR had not changed its pay practices since the first investigation and

12

continued to pay straight time to its drivers for all hours worked in excess of 40 per week.

(Havrilla Decl. ¶¶ 8, 12.)  He spoke with Mr. Seaman and Mr. Hockenberry[7] about the nature of

PNAR's business, interviewed 19 current and former PNAR employees classified as drivers,

reviewed the relevant exemption provisions of the FLSA and concluded that PNAR continued to

violate the FLSA by failing to pay its drivers overtime.  Specifically, he concluded that 72 drivers

were due a total of $105,247.79 in back wages for the period May 2001 to May 2003.  (Havrilla

Decl. ¶¶ 9, 13-15.)

      Mr. Havrilla also considered whether PNAR was exempt under either the taxicab

exemption or the motor carrier exemption, 29 U.S.C. § 213(b)(1).  He considered PNAR's

reliance upon the Field Operations Handbook definition of "business of operating taxicabs" and

the information he obtained from repeated discussions with Mr. Seaman and Mr. Hockenberry.

"Based on my investigative findings, however, I determined that PNAR was not exempt and

discussed this finding with both men."  (Havrilla Decl. ¶ 16.)  Mr. Hockenberry denies that the

issue of the taxicab exemption came up during the first investigation and states that, when Mr.

Seaman attempted to raise it during the second investigation, Mr. Havrilla repeatedly cut him off,

saying words to the effect, "I'm not going to talk about that."  (Hockenberry Aff. ¶ 5.)

      Mr. Havrilla reviews the facts he obtained in his interviews and concludes that:

      Based on the above information obtained during my investigation,
discussions with my supervisor, recent case law including the decision in *Herman
v. Brewah Cab Co.*, 992 F. Supp. 1054 (E.D. Wisconsin 1998) and a W-H
Opinion letter, 1998 WL 852774 (DOL Wage-Hour, April 17, 1998), I determined

---

      [7]In his declaration, Mr. Havrilla referred to discussions with "Seaman and Barker."
(Havrilla Decl. ¶ 15.)  In a Supplemental Declaration (Docket No. 30-2 Ex. A), Mr. Havrilla
explains that this was a typographical error and that he meant to say Seaman and Hockenberry.
(Havrilla Supp. Decl. ¶ 4.)

that PNAR does not qualify for either the taxicab or motor carrier exemption under the FLSA.  Rather the facts obtained during my investigation are virtually identical to those in the <u>Brewah</u> decision, in which the Court found a company providing transportation services with facts virtually identical to that of PNAR, did not qualify for the taxicab exemption under the Act and failed to pay employees overtime as required under the Act.

(Havrilla Decl. ¶ 18.)

Plaintiff filed this action on November 17, 2004, filed an amended complaint on January 20, 2005 (Docket No. 4) and filed a second amended complaint on April 18, 2005 (Docket No. 10).  The second amended complaint alleges that PNAR has failed to pay certain of its employees overtime, in violation of sections 7 and 15(a)(2) of the FLSA, 29 U.S.C. §§ 207, 215(a)(2).

On July 8, 2005, Defendant filed a motion for summary judgment (Docket No. 15).  On August 8, 2005, Plaintiff filed a cross-motion for partial summary judgment (Docket No. 19). On September 19, 2005, Defendant filed a response (Docket No. 24) to Plaintiff's cross-motion for summary judgment and reply brief in support of its own motion for summary judgment. Included in this pleading was a motion to strike portions of the declaration of Wage and Hour Investigator David Havrilla.

<u>Motion to Strike</u>

Defendant moves to strike paragraphs 7-11 and 14-18 of Mr. Havrilla's declaration because they contain hearsay and matters of which Mr. Havrilla does not have personal knowledge.  Plaintiff responds that the statements can be considered on a motion for summary judgment.

While any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form.  Fed.R.Civ.P. 56(e).  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  Moreover, the Court of Appeals for the Third Circuit has held that

"hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." Shelton v. University of Med. & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000) (citation omitted).

The statements in Mr. Havrilla's declaration that are challenged by Defendant relate to various practices of PNAR as reported to him by Mr. Seaman, Mr. Hockenberry and 19 current and/or former PNAR drivers.  (Havrilla Decl. ¶¶ 9-11, 13.)  Mr. Hockenberry contends that Mr. Havrilla's declaration contains many false and/or misleading statements and that any statements other than those in Hockenberry's own affidavit summarizing what he and Mr. Seaman told Mr. Havrilla are false.  (Hockenberry Aff. ¶¶ 3, 6.)  As to the dispute about what Mr. Seaman and Mr. Hockenberry told Mr. Havrilla, the Court cannot resolve it in the context of cross-motions for summary judgment.  Rather, the witnesses can testify at trial and the trier of fact will determine which witness is more credible.

With respect to the 19 current or former drivers at PNAR, Mr. Havrilla personally compiled written or typed statements or notes of the information provided to him by each of the employees he interviewed.  (Havrilla Supp. Decl. ¶ 3.)  Plaintiff submits that "each of the employees could and would likely testify to the contents of their own statements should the matter proceed to trial." (Docket No. 30-1 at 6 n.4.)  Thus, the statements are capable of being admitted at trial and the Court will not strike portions of Mr. Havrilla's declaration reporting them.  If at trial Plaintiff does not produce the employees, Mr. Havrilla's proposed testimony based on what they told him would not be admissible.

        Standard of Review for Motions for Summary Judgment

Summary judgment is appropriate "'if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993).

FLSA Overtime Provisions

The FLSA provides that:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce ... or is employed in an enterprise engaged in commerce ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  The Act states that it is unlawful "to violate any of the provisions of ...

16

section 207 of this title....”  29 U.S.C. § 215(a)(2).  The Secretary of Labor is authorized to bring

actions to enjoin employers from violating the provisions of the FLSA and to recover backwage

compensation and liquidated damages from such employers.  29 U.S.C. §§ 216(c), 217.

Defendant contends that it is covered by the taxicab exemption, which states that the

overtime provisions of § 207 do not apply to “any driver employed by an employer engaged in

the business of operating taxicabs.”  29 U.S.C. § 213(b)(17).  The Supreme Court has held that

“FLSA exemptions are to be ‘narrowly construed against ... employers’ and are to be withheld

except as to persons ‘plainly and unmistakably within their terms and spirit.’”  Auer v. Robbins,

519 U.S. 452, 462 (1997) (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)).

The employer bears the burden of proving the application of an exemption.  Corning Glass

Works v. Brennan, 417 U.S. 188, 196-97 (1974).

Neither the FLSA nor its corresponding regulations define the phrase “business of

operating taxicabs.”  See 29 C.F.R. § 786.200.  However, the DOL’s Wage & Hour Division’s

Field Operations Handbook (FOH), which sets forth the agency’s internal enforcement guidelines

to assist compliance officers, contains this statement:

> The taxicab business consists normally of common carrier transportation in small
> motor vehicles of persons and such property as they may carry with them to any
> requested destination in the community.  The business operates without fixed
> routes or contracts for recurrent transportation.  It serves the miscellaneous and
> predominantly local transportation need of the community.  It may include such
> occasional and unscheduled trips to or from transportation terminals as the
> individual passengers may request, and may include stands at the transportation
> terminals as well as at other places where numerous demands for taxicab
> transportation may be expected.

FOH 24h01 (Aug. 29, 1974).[8]  Courts have concluded that the FOH, as an agency's internal

directive to its employees, is without the force of law and is not entitled to deference under

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45 (1984),

but may be taken into consideration to the extent that it is persuasive.  Klinedinst v. Swift Invs.,

Inc., 260 F.3d 1251, 1255 (11th Cir. 2001).

The only circuit court cases addressing the taxicab exemption date from many years ago,

prior to the publication of the FOH.  Airlines Transportation v. Tobin, 198 F.2d 249 (4th Cir.

1952), involved a limousine service that had fixed routes to and from the airport on a definite

schedule, all conducted intrastate.  Wirtz v. Cincinnati, Newport & Covington Transportation

Co., 375 F.2d 513 (6th Cir. 1967), also involved a service that had trips originating or

terminating at the airport, its vehicles were not metered, they did not have vacancy signs, and

were not advertised as taxicabs.  In both cases, the courts determined that these companies did

not fall within the taxicab exemption.

In Herman v. Brewah Cab, Inc., 992 F. Supp. 1054 (E.D. Wis. 1998), the Secretary of

Labor determined that the taxicab exemption did not apply to a transportation service for the

elderly and handicapped, and the district court agreed.  Although the service had some features

that appeared to suggest that its business was a taxicab operation (charging its customers on a

mileage basis, having rates posted on the dashboard of the vehicle, no fixed routes), other

features were distinguishable: it maintained a list of regular customers and regular passengers

who were permitted to place standing orders for services, drivers were not allowed to cruise for

---

[8]This section of the FOH is attached to Defendant's Appendix as Exhibit C.  The FOH is
available at the DOL's website, http://www.dol.gov/esa/whd/FOH/index.htm.  (Kepplinger Aff.
¶¶ 1, 4 & Ex. A, Def.'s App. Ex. D.)

passengers or wait for them at their homes or destinations, more than one passenger was typically transported in a van at a time, and the service was licensed by the City of Milwaukee not as a taxicab service but as a provider of "handicapped elderly vehicles."[9]

In Cariani v. D.L.C. Limousine Service, Inc., 363 F. Supp. 2d 637 (S.D.N.Y. 2005), the court concluded that a limousine car service fell within the taxicab exemption based on the following factors: the service did not run fixed routes or have a predetermined time schedule, the car drivers could not cruise for passengers but could take steps to obtain regular customers, it served the need of predominantly local transportation, and it had a stand at the Westchester County Airport. The court reviewed the history of the prior cases and noted that they were unhelpful. The strongest counter-argument to applying the taxicab exemption was that, under local regulations, the company was in the business of operating "for hire" cars, not taxicabs. The court noted that, although the fact that an employer was not regulated as a taxicab company was a salient factor in the Brewah case:

> when the application of local regulations clashes with a competent federal interpretation of federal law, the local definition must give way. And when the federal agency responsible for administering the F.L.S.A. (or any law) defines a term that is relevant to the administration of that law, its determination is entitled to considerable deference. The F.L.S.A. is a statute of nationwide application. A uniform definition of the term "business of operating taxicabs" devised by the Department of Labor better serves the purposes of a federal labor law than does application of a variety of local definitions, which are practically guaranteed to lead to different results in different parts of the country.

---

[9]The FOH was not cited in Brewah. However, as noted by the court in Cariani, infra, application of the FOH definition would have made no difference: "the employer still would have been found ineligible for the taxicab exemption, because a significant portion of its business was pursuant to a publicly-subsidized contract for recurrent transportation of handicapped individuals, many of whom were regular passengers taking regularly scheduled trips." 363 F. Supp. 2d at 645.

<u>Id.</u> at 645.

On April 17, 1998 the Wage and Hour Division published an Opinion Letter interpreting the taxicab exception and citing to <u>Brewah</u> with approval.  The letter was in response to a request from a company that provided passenger transportation service for mobility-limited passengers as to the application of the taxicab exemption.  The Opinion Letter noted that the service was initiated through phone requests for transportation, either prescheduled or by immediate dispatch; that the vehicles were radio dispatched and provided door-to-door service to take passengers to the same places a taxi would go, such as to visit friends and relatives, to go shopping, to go to the doctor, to go out to eat, or to any other such destination the passenger requested; that the passengers paid all of the cost or the trip or a part with the remainder paid by a third-party agency; and that the vehicles did not have meters, so the passengers paid a flat rate per trip. The Opinion Letter concluded that:

> While your client's vehicles might be involved in a number of activities associated with taxicab operations, we believe that, overall, your client's vehicles do not service the same transportation needs as taxicabs.  The ordinary meaning of that term contemplates vehicles that are offered for hire to the general public on city streets.  While it is not necessary that all the transportation be provided to persons who "flag down" the vehicles, that is an important aspect of the common meaning of "taxicab" which your client's vehicles do not possess.

> We also note the well-established principle that exemptions under the FLSA are to be construed narrowly, so the drivers of your client's vehicles should not be exempted from overtime unless it is clear that was the intent of Congress.  <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 392 (1960).  Under the above facts, we can find no such clear intent.  Therefore, it is the opinion of the Division that the drivers of the vehicles used to transport mobility-limited passengers would not qualify for the 13(b)(17) overtime exemption.

1998 WL 852774 (DOL Wage-Hour Apr. 17, 1998).

In <u>Mascol v. E & L Transportation, Inc.</u>, 387 F. Supp. 2d 87 (E.D.N.Y. 2005), the court

found that an ambulette service did not qualify for the taxicab exemption. The court noted the following factors: the vehicles were used to transport mobility-limited passengers, they were not licensed as taxicabs, 95% of the business was paid for by the New York State Department of Health through its Medicaid program, the vehicles were not metered and the rates were predetermined. The company argued that its drivers could accept tips, that they could wait between 30 and 45 minutes for passengers and that the business was licensed by the New York City Taxi and Limousine Commission. However, the court noted that the license was a "Paratransit Base License" and not a taxicab license. It concluded that the other facts were insufficient to distinguish the case from <u>Brewah</u>. The court also noted the Opinion Letter from the Wage and Hour Division and the principle that it is "entitled to respect" to the extent that it is persuasive. <u>Id.</u> at 98 (citing <u>Christensen v. Harris County</u>, 529 U.S. 576 (2000)). <u>See</u> <u>Madison v. Resources for Human Dev., Inc.</u>, 233 F.3d 175, 186 (3d Cir. 2000).

In this case, there are many genuine issues of material fact that are disputed between the parties that prevent the Court from ruling in favor of either side in the context of the cross-motions for summary judgment. The undisputed facts in favor of finding that Defendant falls within the taxicab exception are that PNAR uses small vehicles to transport individuals and their property to destinations requested by the individuals, that it does not have fixed routes, that it serves the miscellaneous and predominantly local transportation needs of the community,[10] that it charges based on loaded mile rates (except for its airport transfer service) and that it is licensed to operate call-or-demand and airport transportation services. On the other hand, its vehicles do not

---

[10]Somewhat ironically, Defendant denies Plaintiff's statement that "PNAR's drivers do not typically travel out of the state of Pennsylvania during their employment with PNAR." (Docket No. 19-3 ¶ 37; Docket No. 25 ¶ 37.)

have meters or light domes or operate from taxi stands, the drivers are not permitted to receive tips,[11] the drivers have a schedule that is prepared for them and all changes must be approved by dispatch, PNAR provides predominantly paratransit service, some of the vehicles are equipped with wheelchair lifts, payment for passengers whose transportation was arranged by an agency are paid for by the agency and not by the passenger, and it advertises under "Transportation" in the telephone book, not under "Taxicabs."

The disputed facts are as follows: whether PNAR has contracts for recurrent transportation, whether it makes occasional or unscheduled trips to and from the airport, whether and to what extent it actually operates call-or-demand and airport transportation services, whether drivers can alter their schedules and pick up passengers who "hail" them, whether the paratransit service is almost exclusively for taking elderly and handicapped passengers to medically-related appointments, whether more than one passenger is typically transported at a given time, whether drivers are permitted to wait for passengers, and whether the rates are posted in the vehicles.  The existence of these genuine issues of material fact precludes granting summary judgment for either side.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 15) be denied.  It is further recommended that the cross-motion for partial summary judgment submitted on behalf of Plaintiff Elaine L. Chao, Secretary of Labor (Docket No. 19) be denied.  It is further recommended that the motion to strike portions of the Declaration Under Penalty of Perjury of Wage and Hour Investigator David Havrilla, which was

---

[11]Mr. Hockenberry's testimony that, despite the company policy, some drivers accept tips nonetheless does not make this fact disputed.

attached as Exhibit A to Plaintiff's Appendix of Evidence in Support of Her Cross-Motion for

Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment,

submitted on behalf of Defendant (with Docket No. 24) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written

objections to this Report and Recommendation.  Any party opposing the objections shall have

seven (7) days from the date of service of objections to respond thereto.  Failure to file timely

objections may constitute a waiver of any appellate rights.

Respectfully submitted,


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: November 22, 2005

cc:    Albert W. Schollaert
       United States Attorney's Office
       700 Grant Street
       Suite 400
       Pittsburgh, PA 15219

       Natalie A. Appetta
       Theresa C. Timlin
       United States Department of Labor
       170 South Independence Mall West
       Suite 630E, The Curtis Center
       Philadelphia, PA 19106-3306

       Christina I. Kepplinger
       James G. Seaman
       Eckert, Seamans, Cherin & Mellott
       600 Grant Street
       44th Floor
       Pittsburgh, PA 15219

23